11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Gualberto Flores Menor

Appellant

Vs.                   No.
11-02-00094-CR -- Appeal from Dallas County

State of Texas

Appellee

 

After a
nonjury trial, Gualberto Flores Menor was convicted of burglary of a building[1]
and sentenced to 180 days confinement in a state jail.[2]  We affirm.

                                                                Background
Facts

The
indictment charged that, on or about October 26, 2001, appellant entered a
building which was not then open to the public with the intent to commit theft.








The first
witness, Jose Perez, testified that he had a business named ABest Buy Furniture@ and that his brother, Jesus Perez, had a
business named AFurniture Depot.@  The
two furniture stores were on Harry Hines Boulevard in the City of Dallas.  Both Jose and Jesus had been having Atrouble with burglaries,@ and they were taking turns watching the
stores to see what was going on.  On the
night of October 26, Jose was the one who was watching the stores.  Jose testified that there was a hole in the
fence around his brother=s business.   Jose said that he
was parked across the street because he Akind of had a feeling@ that the burglars were getting in through that hole.  Jose also said that a car stopped and that
three people got out of the car.  The
car drove off, and the three people entered Jesus=s property through the hole in the fence.  Jose said that he called the police and that they Acame out fast.@  Then Jose moved his car to a
different spot.  When the men saw the
police, they ran back inside.  All three
of them were carrying pictures and lamps. 
Jose opened the gate, and the police walked in while Jose waited
outside.  Relevant portions of Jose=s testimony read as shown:

Q: Did the
police ever come back?

 

A: They
came back with one gentleman.

 

Q: They
come back with what?

 

A: With
one man.

 

Q: Is that
man that they came back with in the courtroom today?

 

A: Yes,
sir. [Then the witness identified appellant as the man.]

 

During his
cross-examination, Jose agreed that there are some mobile homes and travel
houses parked on the property next to his brother=s property.  Jose also agreed
that he had not seen the men=s faces when they were going into his brother=s property. 
Jose said that he told the police that appellant was one of the men who
went in because of the way he was dressed and because of his long hair.  During his redirect examination, Jose said
that he was pretty sure that the police had the right guy when they brought
appellant to him for identification Abecause nobody [else] walk in there@ and because of the way appellant was dressed.  

The second
witness, Jesus Perez, testified that he and his brother both sell
furniture.  Jesus=s store is at 11022 Harry Hines
Boulevard.  There is a fence around the
property, and there are two big gates on the front.  On the night of October 26, Jesus said that he was at home and
that his brother was Awatching
the place.@  Jose
called him, and Jesus got there while the police were chasing the guys.  There was a helicopter, and they had Athis guy@ in the police car.  Jesus said
that there were some pictures and lamps which were not where they should have
been and that he had not given appellant permission to enter his property.  

The third
witness, Officer Robert Hay of the Dallas Police Department, testified that he
was assigned to the northwest patrol division on October 26.  Officer Hay identified appellant as the man
who was arrested that night.  Relevant
portions of Officer Hay=s testimony read as shown:

Q:  Officer, what were you doing that night and
how did you come into contact with [appellant] that evening?

 








A: While
on patrol, myself and my partner received a burglary in progress call at the
11000 block of Harry Hines which intersects with Walnut Hill.  At the time the call came in I was in the
2400 block of Walnut Hill, so I was fairly close.  So we took the call and responded to the location.  I turned northbound onto Harry Hines and
entered the furniture warehouse and proceeded to do a drive-by in the front of
the business to see if I could see any signs of forced entry or any suspects.  Typically, what happens we get these types
of calls in the act, they put the call out right away but there=s a delay of one or two minutes to get any
comments on the call, so I didn=t have any knowledge of suspect information at that time.  So I=m looking for forced entry or, you know, possible points where they
could have gone into the business.  We
didn=t see anything initially, so after I drove to
the...west side of the business that faces Harry Hines, I drove around and
turned around and came back to check the south side of the business.  At that point I saw three - -

 

Q: All
right.  We will get to that real
quick.  May I approach?

 

THE COURT:
Yes.

 

Q: Now,
officer, you said that when you got the call you were initially on Walnut
Hill.  [Just show the Judge] how you
approached the scene...using that diagram.

 








A: We were
in the 2400 block at the time of the call and we proceeded to go eastbound on
Walnut Hill.  We turned north onto Harry
Hines and we entered the business.  The
first thing we did was we hit the spotlight on the different entry points of
this section....We did not see anything so we drove around to this side and
didn=t see anything, so I turned around and came
all the way back here, and when I got to about this point here I saw the
suspects jumping over the fence.  There
was two already on the ground.  I couldn=t really see them but I saw the motion, so I
lit the suspect, the spotlight on them and I recognized the suspect wearing a
teal colored shirt still on top of the fence on his way down.  At that point when he hit the ground they
ran this way and we lost contact.  I
lost sight of them.  I couldn=t see them at that point.  So I immediately put on the air that we had
suspects on the air and the direction of travel and we had requested cover
elements.  I knew there was another
business here that was full of RV=s parked and I knew that there was a fence.  I knew this because of prior calls at this park.  I knew that there was another razor fence,
razor topped wire fence right here.  It
would take [the suspects] a few moments to get, to navigate this direction, so
I was requesting cover elements to cover this side to see if they could catch
them running out.  While we did that we
stayed at the front, covered the front, and at that point one of the owners of
the business was parked across the street and he had come across.  He was the one who initially put the call
into 911.  He told us that he had a key
that he could get us into this whole area back here.  We could see if there were anymore suspects inside.  Then we waited to see with cover elements to
cover this side.  Another car pulled
into the front to cover the front.  At
that point we also asked for a helicopter. 
We started doing the search of individual buildings here just to make
sure that nobody else was inside....When the helicopter got up and started
circling the RV lot, that=s when the officers came in from this side, at Denton Drive, and we
came in on this side right here to conduct a search of the park.  During that search another officer spotted
the defendant.

 

                                                           *    *   
*

 

Q: And
when did you see that person again?

 

A: When
another officer detained him and held him for me to identify as a possible
suspect. [The officer then identified appellant as the man who had been
detained by the other officer.]

 

Q: Is
that the same person that you saw on top of the fence leaving Mr. Perez=s property?

 

A: Yes,
sir.

 

Q: You
are absolutely sure of that?

 

A: Yes,
sir.  (Emphasis added)

 

During his
cross-examination by appellant=s attorney, Officer Hay explained that his positive identification of
appellant was based upon the shirt which appellant was wearing, upon the fact
that he had seen that shirt on the man who was going over the fence, and also
upon appellant=s Avery close proximity to the offense location.@ 
Officer Hay agreed that he had not seen appellant=s face when he saw the man going over the fence.








The fourth
witness was Officer Kimberly Filippini of the Dallas Police Department.  She testified that, on the night of October
26, she received a call on the police radio to Aassist on cover for a burglary in progress.”  She testified that, while she was searching the north end of the
RV park, she saw movement out of the corner of her eye.  When she turned and looked, Officer
Filippini saw appellant Acrouching underneath a tree and behind a tree trunk@ from where she was standing.  Officer Filippini testified that appellant
was wearing a Abright blue shirt” and that he had Arip marks on his clothing and scratches on
his hands and his face.@  She also said that his rip
marks Aappeared to be the same kind of rip marks@ which she got on her pants as she jumped
over the barbed wire fence to get into the RV property.  Officer Filippini testified that she gave
appellant the order to Aget on the ground and show [her] his hands.”  Another officer responded to her call for assistance.  That officer took appellant around to
Officer Hay for positive identification.

The State=s final witness was the supervisor over
inmate property for the Dallas County Sheriff=s Department.  He identified the
clothing which appellant was wearing at the time of his arrest.  There was a teal-colored ADevil Rays@ sport shirt with rips on it in various places and a pair of blue jeans
which had rips in various places.

After the
State rested, appellant took the witness stand to swear that he was not the
burglar who had been seen going over the fence.  Appellant testified that he was 24 years old, that he was a
citizen of Mexico, and that he was in this country Aillegally.@  Appellant testified that he
had been looking for work and that he had been living on the streets.  Relevant portions of his testimony during
direct examination read as shown:

Q: On the
night that you were arrested where were you living?  

 

A: There
where the RV=s are.

 

Q: Were
you - - where did you spend that - - where were you sleeping that night?

 

A: There
inside one of the RV=s.  But when I saw the police getting inside the
area I left.

 

Q:
Now...just answer my questions.  All
right.  Did you ever go into that
furniture business?

 

A: No.

 

Q: Do you
know who went into that furniture business?

 

A: No.

 

Q: You
were sleeping in one of the RV=s; is that correct?

 

A: Yes.

 

Q: And why
did you leave the RV?

 








A: Because
I saw the police coming in and because...I was on probation.  I was afraid that they would arrest me so
that=s the reason I left.

 

During his
cross-examination, appellant admitted that he had broken into one of the RV
vehicles and claimed that he had been living there.  Appellant said that he jumped the fence when he was trying to get
away from the police officer and that this was what caused his shirt and jeans
to be torn.

                                                       Points
of Error

Appellant
presents two points of error.  Appellant
argues in the first point that the evidence is Alegally@ insufficient to prove that he was the person
who committed the offense, and appellant 
argues in the second point that the evidence is Afactually@ insufficient to prove that he was the person who committed the
offense.

                                                 Controlling
Authorities

In
reviewing appellant=s
claim that the evidence is Alegally@ insufficient, this court looks at all the
evidence in the light most favorable to the prosecution to determine whether
any rational trier of fact could have found the essential elements of the
offense beyond a reasonable doubt. 
Jackson v. Virginia, 443 U.S. 307, 319 (1979); Vasquez v. State, 67
S.W.3d 229, 236 (Tex.Cr.App.2002).

In
reviewing appellant=s
claim that the evidence is Afactually@
insufficient, we look at all of the evidence in a neutral light.  We will reverse the conviction if the
evidence is Aso obviously weak@ or is Aso greatly outweighed@ by other evidence that the conviction is Aclearly wrong and manifestly unjust.@ 
Vasquez v. State, supra at 236; Clewis v. State, 922 S.W.2d 126, 129
(Tex.Cr.App.1996).

When there
is a nonjury trial, the trial judge is the Aexclusive judge of the credibility of the witnesses and the weight to
be given to their testimony.@  See, e.g., Mattias v. State,
731 S.W.2d 936, 940 (Tex.Cr.App.1987), cert. den=d, 488 U.S. 831 (1988).  In a
nonjury trial, the judge of the trial court is authorized to accept or reject
any or all of the testimony of any of the witnesses, whether they testify for
the State or for the accused.  Mattias
v. State, supra.  The trial court was
not bound to accept appellant=s explanation for why he was hiding from the police when they responded
to the dispatcher=s
report of a Aburglary in progress.@  








The
testimony from Jose Perez, Officer Hay, and Officer Filippini is Alegally@sufficient to support the conviction. 
That testimony would permit a rational trier of fact to find the
essential elements of the offense beyond a reasonable doubt.  That testimony is neither Aso obviously weak@ nor Aso greatly outweighed@ by other evidence that the conviction is clearly wrong and manifestly unjust.  Both points of error are overruled.                             

                                                                This
Court=s Ruling

The
judgment of the trial court is affirmed.

 

BOB
DICKENSON

SENIOR
JUSTICE

 

May 15, 2003

Do not publish.  See TEX.R.APP.P. 47.2(b).

Panel consists of:  Arnot, C.J., and

McCall, J., and Dickenson, S.J.[3]











[1]See TEX. PENAL CODE ANN. '
30.02 (Vernon 2003).





[2]See TEX. PENAL CODE ANN. '
12.35 (Vernon 2003).





[3]Bob Dickenson, Retired Justice, Court of Appeals, 11th
District of Texas at Eastland sitting by assignment.